**UNITED STATES of America**

v.

**Joseph Louis LANZA, also known as Joe Lanza, et al.**

**Crim. No. 71–83.**

United States District Court,
M. D. Florida,
Orlando Division.

March 30, 1972.

John L. Briggs, U. S. Atty., William M. James, Jr., Bernard H. Dempsey, Jr., Asst. U. S. Attys., for the United States.

Ayres, Swigert, Cluster, Tucker & Curry, Ocala, Fla., Roth, Segal & Levine, Orlando, Fla., Frank Ragano, Tampa, Fla., Michael Sigman, Andrew A. Welch, Orlando Fla., Walter G. Arnold, Jacksonville, Fla., James M. Russ, Orlando, Fla., Arnold D. Levine, Tampa, Fla., Clinton A. Curtis, Lake Wales, Fla., James J. Hogan, Miami Beach, Fla., Edward J. Hanlon, Jr., Richard S. Rhodes, Edward R. Kirkland, Leo W. Haley, Orlando, Fla., Richard C. Langford, Lakeland, Fla., David M. Porter, Titusville, Fla., Donald R. Corbett, James S. Byrd, Orlando, Fla., Walter E. Foster, Jr., Daytona Beach, Fla., Harvey C. Poe, Jr., Melbourne, Fla., Dan R. Warren, Daytona Beach, Fla., for Joseph Louis Lanza and others.

## ORDER

TJOFLAT, District Judge.

This case is before the Court on the defendants' motion to suppress wiretap evidence. The evidence was obtained from six wiretaps conducted pursuant to

Court order by the Florida Department of Law Enforcement (FDLE) between May 12 and October 17, 1971. In each instance, the application for the intercept order was authorized by Reubin O'D. Askew, Governor of Florida; an affidavit was presented to Florida Supreme Court Justice James C. Adkins, Jr. by FDLE Special Agent Frank D. Troy; and the order was issued by Justice Adkins. This order is not dispositive of defendants' motion; rather, it is directed to several threshold legal issues they have raised.

I. WHETHER THE GOVERNOR IS AUTHORIZED BY 18 U.S.C. § 2516 TO APPLY FOR A WIRETAP ORDER.

Section 2516(2),[1] Title 18, United States Code, permits the "principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof" to apply to a judge for an order authorizing a wire interception. Florida has chosen to implement this section by designating, among others, its chief executive officer, the Governor to authorize initial applications for monitoring. Fla.Stat. § 934.07, F.S.A.[2] The question is whether the

1. § 2516(2) provides:
   The principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof, if such attorney is authorized by a statute of that State to make application to a State court judge of competent jurisdiction for an order authorizing or approving the interception of wire or oral communications, may apply to such judge for, and such judge may grant in conformity with section 2518 of this chapter and with the applicable State statute an order authorizing, or approving the interception of wire or oral communications by investigative or law enforcement officers having responsibility for the investigation of the offense as to which the application is made, when such interception may provide or has provided evidence of the commission of the offense of murder, kidnapping, gambling, robbery, bribery, extortion, or dealing in narcotic drugs, marihuana or other dangerous drugs, or other crime dangerous

to life, limb, or property, and punishable by imprisonment for more than one year, designated in any applicable State statute authorizing such interception, or any conspiracy to commit any of the foregoing offenses.

2. § 934.07 Authorization for interception of wire or oral communications.
   The governor, the department of legal affairs, or any state attorney or any county solicitor, having jurisdiction to prosecute felonies in his respective jurisdictions may authorize an application to a judge of competent jurisdiction for, and such judge may grant in conformity with this chapter, an order authorizing or approving the interception of wire or oral communications by the department of law enforcement or any law enforcement agency of this state or any political subdivision thereof having responsibility for the investigation of the offense as to which the application is made, when such interception may provide or has provided evidence of the

chief executive officer of the State is within the contemplation of the federal statute authorizing the "principal prosecuting attorney" of the State to make an initial approval.

■ Initially, it should be observed that the purpose of Congress in enacting the section in question was clearly not to designate a particular officer by name or title, but, rather, to provide for the making of policy decisions at the highest practicable policy-making levels.

In most States, the principal prosecuting attorney of the State would be the attorney general. The important question, however, is not name but function. *The intent of the proposed provision is to provide for the centralization of policy* relating to statewide law enforcement in the area of the use of electronic surveillance in the chief prosecuting officer of the State. *Who that officer would be would be a question of State law.* (Emphasis added). Senate Report No. 1097, U.S.Code Cong. & Admin.News (1968) p. 2187.

The question to be decided by whomever makes the prior executive approval of any application for electronic interception is not one of law but policy. The legal sufficiency of an application is not what is to be determined at the prior executive approval level. A particular application may meet all the legal requirements, and electronic monitoring may well be lawful in a particular case; but the executive still must decide whether monitoring *should* be used. His determination is whether a particular proposed use of these techniques would be consistent with the overall policy respecting monitoring which has been, or should be, followed by the State. It fol-

lows, then, that the greater the degree of public responsibility attributable to the executive making the initial determination of approval, and the higher his public visibility, the greater is the likelihood that he will be called to account for errors in administration of policy and that the safeguards of the federal statute will be effective.

It was precisely these considerations that led Congress to enact a statute limiting the number and kind of persons who could initiate administrative proceedings leading to federal electronic monitoring, and that led the Court of Appeals for the Fifth Circuit recently to conclude that the power to authorize initial applications could not be delegated by the Attorney General to an inferior under the general delegation statute, 28 U.S.C. § 510.[3]

By expressing its intention that only "a publicly responsible official, subject to the political process" could initiate a wiretap application, Congress wanted to make certain that every such matter would have the personal attention of an individual appointed by the President and confirmed by the Senate. Its reasoning was that this narrow limitation to top department officials would (1) establish a unitary policy in the use of the awesome power conferred, and (2) require that power to be exercised with a circumspection reenforced by ready identifiability of he who was responsible for its use, thus maximizing the guarantee that abuses would not occur. United States v. Robinson, (5th Cir., January 12, 1972, No. 71–1058).

In carrying out these safeguards in its statute, Florida has chosen to delimit

---

commission of the offense of murder, kidnapping, gambling (when the same is of an organized nature of carried on as a conspiracy in violation of the laws of this state), robbery, burglary, grand larceny, prostitution, criminal usury, abortion, bribery, extortion, dealing in narcotic drugs or other dangerous drugs, or any conspiracy to commit any violation of the laws of this state

relating to the crimes specifically enumerated above.

3. § 510. Delegation of authority.
The Attorney General may from time to time make such provisions as he considers appropriate authorizing the performance by any other officer, employee, or agency of the Department of Justice of any function of the Attorney General.

this authority even more severely than does the statute governing federal applications. The Florida statute authorizes no delegation whatever. Applications may be approved initially only by the particular person who is the prosecutorial head of each jurisdiction in the State, as well as the State's legal department, and the one person to whom all are responsible, and who is superior in title and responsibility to each and all of them—the Governor.[4] Florida thus presents a situation which is precisely the opposite of that considered in *Robinson*. Here, the question is not whether someone inferior to the Attorney General may perform the function of approving applications, but whether his superior may do so. In considering this ques-

tion, it may be instructive to inquire into the likely result in *Robinson* had the person authorizing the application been, not a Deputy Assistant Attorney General, but the President of the United States—the only federal executive officer superior to the Attorney General in title and responsibility, and the only federal officer comparable in public visibility and accountability to the Governor on the state level.

■ The defendants argue that *Robinson* stands for a strict reading of the statute, not for permitting the states to designate the officials who should make the policy decisions regarding applications for wiretap orders. A strict reading of 18 U.S.C. § 2516(1)[5] is consist-

4. The relations among the Governor, the Attorney General, and the several state attorneys and county solicitors are somewhat complex. The Governor is, of course, the repository of "[t]he supreme executive power." Const., Art. IV, Sec. 1, F.S.A. The Attorney General is a member of the Governor's cabinet and is the "chief state legal officer." Const., Art. IV, Sec. 4(c). Both the Attorney General and the Governor may bring suits in their own names on behalf of the State, though the Governor's power in this respect is more limited than that of the Attorney General. Const., Art. IV, Sec. 1(b); Fla.Stat. § 16.01, F.S.A. The Attorney General may be required to report to the Governor concerning the performance of his official duties. Const., Art. IV, Sec. 1(a); he is third in the order of gubernatorial succession, Fla.Stat. § 14.055, F.S.A.; in the event of his disability the Governor may appoint a person to perform his duties, Fla.Stat. § 16.02, F.S.A.

The Attorney General possesses a general supervisory power over state attorneys and may, on their request, issue opinions of law to them. Fla.Stat. § 16.08, F.S.A. This relation apparently does not exist between the Attorney General and county solicitors. The Governor, on the other hand, may require state attorneys to exchange circuits, assign any state attorney to discharge the duties of, or proceed to another circuit to assist, any other state attorney, Fla.Stat., §§ 27.14, 27.15, F.S.A.; he may appoint other persons to fill vacancies and may suspend incumbents. Const., Art. IV, Secs. 1(f), 7.

5. § 2516. Authorization for interception of wire or oral communications.

(1) The Attorney General, or any Assistant Attorney General specially designated by the Attorney General, may authorize an application to a Federal judge of competent jurisdiction for, and such judge may grant in conformity with section 2518 of this chapter an order authorizing or approving the interception of wire or oral communications by the Federal Bureau of Investigation, or a Federal agency having responsibility for the investigation of the offense as to which he application is made, when such interception may provide or has provided evidence of—

(a) any offense punishable by death or by imprisonment for more than one year under section 2274 through 2277 of title 42 of the United States Code (relating to the enforcement of the Atomic Energy Act of 1954), or under the following chapters of this title: chapter 37 (relating to to espionage), chapter 105 (relating to sabotage), chapter 115 (relating to treason), or chapter 102 (relating to riots);

(b) a violation of section 186 or section 501(c) of title 29, United States Code (dealing with restrictions on payments and loans to labor organizations), or any offense which involves murder, kidnapping, robbery, or extortion, and which is punishable under this title;

(c) any offense which is punishable under the following sections of this title: section 201 (bribery of public

ent with the language of the statute, since it specifically names the officers concerned. In § 2516(2)[6], however, Congress was faced with fifty state statutory schemes for parceling out the state's law enforcement powers. The section must be construed so as to permit each state to fit its scheme into the framework of the federal statute even though the distribution of power or the names of the officers may differ from state to state. Assuming for the moment that § 2516(2) should be strictly construed as argued by the defendants, the only officers in Florida able to apply for wiretap orders would be the county solicitors. The Governor would not qualify since he is not named in the federal statute; nor would the Attorney General, since he is not named in the Florida statute (Fla. Stat. § 934.07, F.S.A. names the department of legal affairs); nor would the state attorneys for the various judicial circuits, because judicial circuits are not political subdivisions.

It is true, as defendants urge, that the federal statute envisions no "further breakdown" below the county level. The idea is to start at the top of the law enforcement policy process and work down to that level. Florida has not attempted further breakdown; the Legislature has simply said that the Governor is at the top of this process.

In this case there can be no doubt that the Governor of Florida, in all respects material to the determination of the propriety of wiretaps as a matter of state policy, is superior to the Attorney General and to state attorneys. As the chief executive, he is superior to all other members of the executive branch to the extent their functions relate to his. It is the Governor, not his legal representative, who formulates basic state policy, and who reports to the public on the execution of state policy. In sum, it is the Governor, to a greater degree than any other public officer, who fits the criterion set by Congress and referred to by the Court of Appeals as "a publicly responsible official, subject to the political process [with] ready identifiability of he who was responsible for its use, thus maximizing the guarantee that abuses would not occur." United States v. Robinson, *supra.*

The defendants are thus in the anomalous position of complaining that they received, under the Florida statute, more protection, rather than less, than the federal statute requires. Instead of the

officials and witnesses), section 224 (bribery in sporting contests), subsection (d), (e), (f), (g), (h) or (i) of section 844 (unlawful use of explosives), section 1084 (transmission of wagering information), section 1503 (influencing or injuring an officer, juror, or witness generally), section 1510 (obstruction of criminal investigations), section 1511 (obstruction of State or local law enforcement), section 1751 (Presidential assassinations, kidnapping, and assault), section 1951 (interference with commerce by threats or violence), section 1952 (interstate and foreign travel or transportation in aid of racketeering enterprises), section 1954 (offer, acceptance, or solicitation to influence operations of employee benefit plan), section 1955 (prohibition of business enterprises of gambling), section 659 (theft from interstate shipment), section 664 (embezzlement from pension and welfare funds), sections 2314 and 2315 (interstate transportation of stolen property), section 1963 (violations with respect to racketeer influenced and corrupt organizations) or section 351 (violations with respect to congressional assassination, kidnaping and assault);
(d) any offense involving counterfeiting punishable under section 471, 472, or 473 of this title;
(e) any offense involving bankruptcy fraud or the manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic drugs, marihuana, or other dangerous drugs, punishable under any law of the United States;
(f) any offense including extortionate credit transactions under sections 892, 893, or 894 of this title; or
(g) any conspiracy to commit any of the foregoing offenses.

6. Set out in note 1 *supra.*

Attorney General or a state attorney, the Governor himself—the public officer who, alone, is in a position to ensure a completely centralized policy concerning wiretapping—personally examined the application and pronounced it consistent with the public policy of the State of Florida. There is no way by which the intention of Congress could have been more completely effectuated.

█ It is clear that the Governor represents the State in matters of policy, and in such matters, with which the federal statute is concerned, he is superior to all "prosecuting attorneys" of the State, however they or he might be technically denominated. Florida's designation of its Governor to determine the propriety of applications for monitoring complies fully with the federal requirements and ensures the guarantees the statute intends to preserve.

## II. WHETHER FLORIDA SUPREME COURT JUSTICE ADKINS IS A "STATE COURT JUDGE OF COMPETENT JURISDICTION" UNDER 18 U.S.C. § 2516(2).

█ A "State court judge of competent jurisdiction" is defined in 18 U.S.C. § 2510(9) (b) [7] as "a judge of any court of general criminal jurisdiction." The defendants contend that this language encompasses only judges of circuit courts and criminal courts of record in Florida. They suggest that a justice of the Florida Supreme Court has general criminal jurisdiction only when he is assigned by the Chief Justice to sit as a circuit judge. Defendants' argument, if valid, would mean that Justice Adkins' jurisdiction to try criminal cases is conferred upon him by the Chief Justice.

It is clear, however, that it is the Florida Constitution, not the designation or assignment by the Chief Justice, that confers jurisdiction on the individual justices. The Chief Justice merely designates which judicial task a justice is to perform at a given time. So, the defendants must concede that a "judge of competent jurisdiction" issued the wiretap order. Their real argument, then, is that the order is a nullity because Justice Adkins was wearing the robe of a Supreme Court Justice, not a Circuit Judge, when he signed it.

The strict interpretation urged by the defendants would mean that no judge could issue a wiretap in counties having both a circuit court and a criminal court of record, since there the criminal jurisdiction is split between those courts and neither has "general" criminal jurisdiction. In Duval County, for example, a Circuit Judge tries capital crimes only; all other felonies are tried in the Criminal Court of Record. However, the same Circuit Judge hears all felony cases when holding court in the other counties in his circuit, because they have no Criminal Court of Record. Defendants would presumably argue that he would be powerless to enter a wiretap order on an application presented in Duval County but could do so elsewhere in the circuit. The proper and more logical interpretation is that wherever he might be sitting he would be a "judge of competent jurisdiction."

The defendants' position that a trial judge, not a Florida Supreme Court Justice, must issue a state wiretap order is incompatible with the provisions governing federal court authorization of wire intercepts. Section 2510(9) (a), Title 18, United States Code, [8] empowers both district and court of appeals judges to issue such orders; and it is manifest from this provision that Congress did not contemplate the issuance of wiretap orders by trial judges alone. The legis-

7. § 2510. Definitions. As used in this chapter—

&ast; &ast; &ast; &ast; &ast;

(9) "Judge of competent jurisdiction" means—

(b) a judge of any court of general criminal jurisdiction of a State who is authorized by a statute of that State to enter orders authorizing interceptions of wire or oral communications.

8. § 2510.

(9) "Judge of competent jurisdiction" means—

(a) a judge of a United States district court or a United States court of appeals.

lative history of this section makes it clear that the concern of Congress was to prevent low-level decisions in the sensitive area of electronic surveillance. The Senate Report notes that the practice of letting U. S. Commissioners and city mayors issue search warrants is "too permissive for the interception of wire and oral communication. . . . This is intended to guarantee responsible judicial participation in the decision to use these techniques." Senate Report No. 1097, 1968 U.S.Code Cong. & Admin.News p. 2179. As with the Governor issue, the defendants are in the position of complaining of too much rather than too little protection from the Florida statute.

In enacting Section 2510(9) (b), Congress obviously did not intend to name the state courts that could issue wiretap orders; rather, it described the quality of judicial officer who should pass upon such matters. The Florida Legislature could not possibly have responded better to Congress' quest for a guaranty of "responsible judicial participation" than by authorizing the justices of the Supreme Court of Florida to issue wiretap orders.

III. WHETHER A VIOLATION OF THE FLORIDA LOTTERY LAW IS AN OFFENSE FOR WHICH AN INTERCEPT ORDER MAY BE ISSUED UNDER 18 U.S.C. § 2516 (2) AND FLORIDA STATUTES § 934.07.

█ No interception order can be issued by a state judge unless the wiretap may provide evidence of an offense spec-

ified in 18 U.S.C. § 2516(2).[9] One of those offenses is gambling. Likewise, a federal order may issue where a violation of 18 U.S.C. § 1955, prohibiting illegal gambling businesses, is apparent.[10] The applications and orders issued in this case all recite that the proposed intercepts may provide evidence of the violation of Florida Statutes § 849.09, which makes it unlawful to conduct a lottery.[11] Defendants contend that conducting a lottery is not "gambling" within the meaning of the Florida wiretap law, specifically Section 934.07 which permits wire interception for the "offense of . . . gambling."[12] They insist that the only Florida statute dealing with gambling is Section 849.08, which provides for the punishment of anyone who plays "in any game at cards, keno, roulette, faro or other game of chance." [13]

This Court cannot adopt the view that Congress and the Florida Legislature enacted such comprehensive legislation simply to strike out at organized poker games. A reading of the federal statute makes it clear that Congress had other things in mind. 18 U.S.C. § 1955(b) (2) defines gambling to include "conducting lotteries, policy, bolita or numbers games."[14] These are the offenses for which a federal wiretap order could be issued. Nothing in the statute or the legislative history indicates that Congress intended a more restrictive interpretation to be placed upon the states' authority to investigate gambling offenses. This is even more obvious when it is considered that one of the elements of an 18 U.S.C. § 1955 violation is that

9. Set out in note 1 *supra.*

10. 18 U.S.C. § 2516(1) (c). *See* note 5, *supra.*

11. Florida Statutes § 849.09 makes it unlawful to promote, conduct, set up, advertise, assist, attempt to operate, possess any equipment or tickets for, sell or assist in the sale of tickets for, or possess any advertising for any lottery or lottery drawing.

12. *Supra* note 2.

13. § 849.08. Gambling.
Whoever plays or engages in any game at cards, keno, roulette, faro or other game of chance, at any place, by any device whatever, for money or other thing of value, shall be punished by imprisonment not exceeding ninety days, or by fine not exceeding one hundred dollars.

14. 18 U.S.C. § 1955 provides in part: (b) (2) "gambling" includes but is not limited to pool-selling, book-making, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.

there be a violation of a state law.[15] Thus, the defendants would suggest that a federal intercept order could have issued to investigate their alleged lottery business in Florida but the state order was inappropriate.

This Court must conclude that the Florida Legislature did not intend to limit the scope of monitoring to Florida Statute § 849.08 violations. Its use of the term "gambling" was in the generic sense and was meant to include any offense which could be construed as gambling. Chapter 849, Florida Statutes, of which Section 849.08 is a part, is entitled "gambling" and deals with, *inter alia*, lottery, keeping of gambling houses, bookmaking, and manufacturing of gambling devices. Nowhere in the chapter is gambling or the offense of gambling defined. The Court would be hard pressed to limit "gambling," as used in the wiretap statute, to its statutory definition when there is none. Moreover, the Florida Supreme Court has made it clear that gambling is a broad term and constitutes an offense if condemned by statute in nothing more than generic terms, regardless of the name or operation of the particular game or scheme. Creash v. State, 131 Fla. 111, 179 So. 149 (1938). It can fairly be anticipated that that Court would consider lottery as a form of gambling and, accordingly, a proper object of wiretap surveillance under the Florida law. An ample predicate for such a holding is present in the statute itself. The offense designated is that of "gambling (when the same is of an organized nature or carried on as a conspiracy in violation of the laws of this state)."[16] The defendants cannot seriously urge that this language was intended to be applied only to "cards, keno, roulette, faro or other game of chance"[17] if they are "of an organized nature or carried on as a conspiracy."

Those games of chance are not normally carried on in such a manner. The obvious purpose of the parenthetical phrase in the statute was to exclude, rather than to include, games of that type. The purpose was to equip the state's law enforcement officials with the necessary tools to investigate and combat organized lottery, bookmaking, and similar operations, all of which come within the generic phrase, the offense of gambling.

As a corollary argument, defendants point out the offenses charged in the indictment do not carry a sentence of more than a year. Specifically subsections (e), (f), (g), (h), (i), (j), and (k) of Florida Statutes § 849.09(1), F.S.A., Florida Statutes § 849.14; and Florida Statutes § 849.25 all carry maximum sentences of less than one year. Only Florida Statutes § 849.09(1) (a), (b), (c), and (d) carry sentences of one year or more. 18 U.S.C. § 2516(2) permits states to use wiretap investigation only if the interception may provide evidence of one of the enumerated offenses *and* the offense is punishable by imprisonment for more than a year. Nothing in the statute or the legislative history, however, indicates that other offenses discovered during the course of a proper intercept may not be prosecuted, regardless of the nature of the offense or the prescribed punishment.

## IV. WHETHER THE AFFIDAVIT IN SUPPORT OF THE ORIGINAL APPLICATION MEETS ALL CONSTITUTIONAL AND STATUTORY REQUIREMENTS AND IS SUFFICIENT TO WARRANT GRANTING THE APPLICATION.

In determining the sufficiency of an application to permit electronic monitoring of telephone conversations, there are three areas in which the statute (18 U.

15. As used in 18 U.S.C. § 1955:
    (b) (1) "illegal gambling business" means a gambling business which—
    (i) is a violation of a law of a State or political subdivision in which it is conducted.

16. Fla.Stat. § 934.07, F.S.A. *supra*, note 2.

17. Fla.Stat. § 849.08, F.S.A, *supra*, note 13

S.C. § 2518[3]) requires that probable cause be shown. These are (1) that a particular person has committed, or is about to commit, one of several enumerated offenses including gambling; (2) that particular communications relating to that offense will be obtained through the interception applied for; and (3) the premises from which the interception will be made are being used in connection with the offense or are leased by, listed to, or commonly used by the person who is committing the offense. The government insists that, under applicable constitutional standards, the affidavit meets each of these requirements in full.

■ Two quite distinct areas must be explored in making this determination —whether the information contained in the affidavit is of such character that a magistrate may credit it in determining whether probable cause has been established, and whether, once it has been determined that the information is creditable, it establishes probable cause. Though the considerations overlap to some extent, they are distinct questions. The method of analysis of the first of these questions derives from decisions of the Supreme Court in cases such as Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). In essence, where the affidavit relies on information furnished by an informant for probable cause, it must demonstrate two things—(1) that the informant himself is personally reliable and trustworthy, and (2) that the information furnished by him was gained in a reliable way. A deficiency in the demonstration of either of these two elements may be overcome by independent corroboration obtained

through normal police investigative procedures. An extensive analysis of this test is contained in United States v. Sequella-Avendano, 447 F.2d 575 (5th Cir. 1971).

The information set out in the affidavit, which led to the monitoring of a telephone number listed to Simon's Cab and Janie and John Simon and located at the Simons' residence, comes from a variety of sources. The bulk of it comes from either personal investigation made by the affiant of telephone records and other sources, personal investigation made by an officer of the Bartow, Florida, Police Department, an informant previously used in other investigations by the Florida Department of Law Enforcement, and an informant supplied by the Federal Bureau of Investigation. A third informant, furnished by the Sheriff of DeSoto County, Florida, provided little specific information used in the affidavit.

■ We turn first to the initial test of the informants' personal reliability. (It would seem apparent that this test has no application to the affiant himself or to any other regularly employed police officer, whether working in uniform or under cover; and no court has ever held or intimated that it does so apply.[18]) The first of the informants is a person who (1) is personally known to the affiant, (2) has on numerous previous investigations worked with the FDLE, and (3) has on numerous previous occasions furnished information to that agency which led to arrests and convictions. The courts have repeatedly held that, in considering the sufficiency of an affidavit, an informant may be gauged reliable by the magistrate if it is shown from the affidavit that he has a record of past reliability.[19] This is a

---

18. See United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965) ; McCreary v. Sigler, 406 F.2d 1264, 1269 (8th Cir. 1969) : "The reliability of a fellow police officer speaks for itself."

19. A few of the many cases holding that a statement showing a history of past relia-

bility is sufficient to show that he is a reliable person are Jones v. United States, 362 U.S. 257, 268, 80 S.Ct. 725, 734, 735, 4 L.Ed.2d 697 (1960), ". . . the source of the information . . . 'has given information to the undersigned on previous occasion and which was correct;' " United States v. Vigo, 413 F.2d

natural consequence of the avowed purpose of this first *Spinelli* test—not to bring the informant before the court, or to test the specific information he furnished on the particular occasion, but to establish the fact that the information comes from a person not given to invention and false accusation. Where a particular informant has been used regularly by a law enforcement agency and has established a pattern of furnishing information which repeatedly proves itself true, there is sufficient reason to believe that he is a reliable person. The vice of the affidavits in *Aguilar* and *Spinelli* was that, in each case, they recited simply the affiants' conclusion that the informant was a reliable person without stating why he was believed to be reliable. In *Aguilar* the only reference to the informant was the conclusion that he was a "credible person;" the only statement in *Spinelli* was that the source was "a confidential reliable informant." In the present case the information relating to the FDLE informant goes beyond that and shows why he is to be considered personally reliable—he has been regularly used before and the information he had previously furnished has met the acid test of leading to convictions of the persons about whom he gave information.

The second informer, supplied by Sheriff Cline of DeSoto County, was similarly shown to be reliable inasmuch as he was regularly used by the Sheriff, who had personally verified the truth of the information furnished.

The third informant was supplied by FBI Special Agent Brooks Roberts. This informant's history is not recited in the affidavit. However, the affidavit does contain other information bearing on the question. Four specific transactions were reported by this informant. On at least three of these (the affidavit is unclear as to the fourth) Special Agent Roberts was present and able to observe the transaction in which his informant participated. It is doubtful whether the information from this source should even be treated under the "informant" standard of *Aguilar* and *Spinelli*, inasmuch as it was verified by the personal observation of a regular, identified law enforcement officer at the moment the events described occurred.

Turning to the second test, it must be established that the information contained in the affidavit, whether based on direct investigation by the affiant or on information supplied by an informant, was obtained by the person furnishing it in a reliable manner. The first, FDLE, informant provided general information that Lee and Lillian Lockett were major figures in an extensive lottery operation in Polk County, Florida. He further identified John and Janie Simon, the operators of Simon's Cab Company, as major lottery writers who also picked up sales of other writers and delivered sales and records to the Locketts. This information, as the affidavit reveals, was obtained in the most reliable of all possible ways—by the personal observation and participation of the informant. During his active participation in the investigation in 1969 and 1970, the informant personally placed wagers at Lee Lockett's business establishment, with Lockett's son, George Lockett, and with Janie Simon at her residence. These wagers

691 (5th Cir. 1969), ". . . an informant who has proven to be reliable in the past on several occasions in his utilization as an informant for the Federal Bureau of Narcotics . . . ;" United States v. Kidd, 407 F.2d 1316 (6th Cir. 1969), ". . . a confidential and reliable source which proved to be reliable on many occasions in the immediate past."; Brooks v. United States, 416 F.2d 1044 (5th Cir. 1969), informant had reputation for veracity and on previous occasions furnished information which, on every such occasion, was proved true; United States v. Acarino, 408 F.2d 512 (2nd Cir. 1969), informant had furnished information leading to convictions on five previous occasions; United States v. Stallings, 413 F.2d 200 (7th Cir. 1969), informant's information had led to four previous convictions; United States v. Gazzard Colon, 419 F.2d 120 (2d Cir. 1969), informant's information had led to three previous arrests and seizures of contraband.

were placed numerous times during the period of investigation. In addition to the specific wagers placed, the informant observed John Simon using the Simon telephone taking what appeared to be wagers, *while the informant was personally placing wagers with Janie Simon inside the Simon residence.* It should go without saying that where the affidavit reveals that the information is based on the personal observation and participation of the informant in the transactions under investigation, it satisfied the test of showing that the information was obtained in a reliable manner.[20]

The second informant, supplied by Sheriff Cline, principally furnished general information adding nothing to what had been supplied previously by the FDLE informant. The only new item was his statement that there were two writers operating in Fort Meade, including Catherine Williams. The manner in which he obtained this particular item of information was not detailed.

The third, FBI, informant, like the first, obtained the information he gave by direct personal observation and participation. His information consisted of the fact that on three occasions between March 24 and May 4, 1971, he had personally purchased tickets on the Puerto Rican lottery from Janie Simon at her residence, and that on one occasion he observed another person dial telephone number 425–3644, verified to be listed to the Simons, and place a wager with a person addressed as "Janie."

All other information contained in the affidavit has its source in personal investigation of the various law enforcement officers. The information concerning the manner of operation of lotteries generally is derived from the affiant's personal experience over several years of investigation. All information relating to the listings of telephones and toll calls is obtained from telephone company records by *subpoena duces tecum.*

The background information on the Locketts and Janie Simon was obtained by his personal check of police records. The reports of transactions in February through May, 1971, were obtained by the Bartow policeman by means of his personal observation and participation while under cover. The transactions reported by the FBI informant were also observed personally by Special Agent Roberts. In sum, with respect to every single statement in the affidavit, with the possible exception of the attribution of a dealership to Catherine Williams, the information is shown on the face of the affidavit to have been gained in a reliable manner.

Finally, even where one or both of the *Spinelli* tests is not fully satisfied on the face of the portion of the affidavit dealing with the informant or other source of information, it may be sufficient if the information is corroborated by other reliable independent sources. With this in mind, we turn to the question of corroboration. The FDLE informant identified three major figures—Lee and Lillian Lockett and Janie Simon—and two minor figures—George Lockett and John Simon—as participants in an illegal lottery operation. Much of his information came from his personal observation. In addition, the affidavit recites the known and documented criminal gambling records of these persons. Lee Lockett, of twenty-nine total arrests, was arrested twelve times for gambling offenses with three gambling convictions. Lillian Lockett has six gambling arrests and one gambling conviction. Janie Simon had one gambling arrest with unknown disposition. These criminal records provide substantial corroboration to the information furnished by the informant. This specific information is in sharp contrast to the reputation allegation in *Spinelli* that the defendant there was known "as a bookmaker, an associate of bookmakers, a gambler, and an associate of gamblers"

---

**20.** *See, e. g.,* United States v. Hood, 422 F.2d 737 (7th Cir. 1970) ; United States v. Aldrete, 414 F.2d 238 (5th Cir. 1969) ;

United States v. Kidd, 407 F.2d 1316 (6th Cir. 1969).

which the Supreme Court described as "but a bald and unilluminating assertion of suspicion." 393 U.S. at 414, 89 S.Ct. 584, at 588, 21 L.Ed.2d 637. Definite and concrete information concerning past criminal activities of the type under investigation is vastly different from an assertion of suspicion, and is a form of corroboration that makes a later allegation of similar activities "much less subject to scepticism than would be such a charge against one without such a history." Jones v. United States, *supra*, 362 U.S. at 271, 80 S.Ct. at 736.[21] Most recently, in United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L. Ed.2d 723 (1971) the Supreme Court held evidence of reputation substantially less specific than that present in the affidavit here to be corroborative of the informant's reliability and of his information. Even the dissenting Justices in *Harris* had no quarrel with the proposition that evidence of reputation may be corroborative; the dispute was only over whether the evidence of reputation in *Harris* was sufficiently specific to be distinguishable from that found to be only an "assertion" in *Spinelli*, and over the question whether the defendant's reputation could provide corroboration for a deficiency in the first of the *Spinelli* tests—the informant's personal reliability.[22] However, it is clear, under the views expressed by either the majority or the dissent in *Harris*, the first, at least, of the *Spinelli* tests is met without any need for extraneous corroboration, inasmuch as each of the informants had previously furnished information which was proved true. Even the dissenting Justices agreed that the fact that an informant purported to speak from personal observation could corroborate his *personal* credibility, if he was a person who was responsible to the affiant, inasmuch as he could be called to account if a search based on his claimed observa-

tion failed to reveal incriminating evidence. The dissenting Justices, therefore, would have, in a case like this one, given additional credit to the three informants who furnished information about the gambling enterprises, since all were responsible to identified law enforcement officers, and all were employed in a continuing relationship with those officers.

Further corroborative of the information supplied by the third, FBI, informant is the fact that Agent Roberts personally observed at least three of the transactions reported by him.

Perhaps the most thorough corroboration of the informants' information is to be found in the direct purchases made by a regular police officer from Beulah Griffin, Hazel Mosley, Beatrice Polite, Mary (Tiny) Williams, George Williams, and Janie and John Simon. The elaborate precautions which the sellers, particularly the Simons, took before permitting him to buy tickets further confirmed the account given earlier by others. It should be noted particularly that the purchases from Janie Simon were made up to within a week of the date of the application.

In sum, it cannot be doubted seriously that the affidavit met both of the *Spinelli* tests, enabling a magistrate to determine for himself that the informants were likely telling the truth and that their information was likely accurate. Nor can it be doubted that the affidavit provided sufficient cause to believe that the Simons and others were engaging in a pattern of conduct, continuing up to within a few days of the application, of taking lottery wagers, paying off on winning numbers, making records and doing other acts connected with the illegal enterprise. Indeed, the defendants do not seriously contest this aspect of the affidavit. As one of their memoranda states, "It is obvious from a cursory

---

21. See also United States v. Bridges, 419 F.2d 963 (8th Cir. 1969); United States v. Chin Dan Fook, 413 F.2d 1016 (2d Cir. 1969); United States v. Kuch, 301 F.Supp. 965 (D.D.C.1969).

22. 403 U.S. at 597–598, 91 S.Ct. 2075, 29 L.Ed.2d 723 (Harlan, J., dissenting).

reading of the affidavits and applications for interception orders in 71–2 through 71–7, that the State had sufficient evidence to prosecute each of the named individuals in the interception orders." [23] The only serious question, therefore, is whether the affidavit showed, in addition to the illegal activity itself, sufficient reason to believe that the Simons' telephone was being used as an integral part of the enterprise.

As noted previously, the affidavit must establish probable cause in three different areas—the criminal offense being committed by the subject, the communication relative to the offense obtainable through monitoring, and use of the facilities in connection with the offense by the subject. The first of these is demonstrated as discussed above. The third, likewise, is hardly open to question. Telephone company records showed that the telephone which was the subject of the initial application was listed to Janie and John Simon. They were listed as being in control of the premises on which it was installed. Personal observation by informants and law enforcement officers on repeated occasions over a long period of time demonstrated that they were engaging in the business of accepting lottery wagers, providing lottery information and paying off winning numbers at that location.

The final test, then is whether the application showed probable cause to believe that conversations concerning the illegal enterprise would be found by the use of monitoring. The affidavit provides information relative to the use of the Simons' telephone on three different occasions, two specific instances observed by informants, and a pattern of calls obtained from telephone company records continuing from February 1971 through May, to the latest records available from the company before the application was presented. On the first occasion, the FDLE informant observed John Simon taking "what appeared to be wagers" over the Simon telephone. The defendants' memorandum denigrates the importance of this occurrence, emphasizing the phrase "appeared to be." However, the memorandum disingenuously omits the context of the conversation from discussion. The observation was made by the informant while inside the Simon residence and while he was engaged in the act of placing a wager with Janie Simon. This fact is of crucial significance in assessing the opinion expressed; placed in this context the observation states that, from every appearance, John Simon was doing exactly the same thing on the telephone that the informant knew Janie Simon to be doing at that moment in person. He thus had an ideal basis on which to assess the significance of John Simon's call.

The second instance, on March 26, 1971, was observed by the FBI informant. He personally saw the Simon number dialed, heard a wager being placed with a person answering the telephone who was addressed by the bettor as "Janie."

Thus, the affidavit shows a pattern of conduct and two concrete instances of known use by which to assess the significance of the telephone toll records. There is a further item of information which serves as background to the toll records—the detailed account of the different kinds of illegal lotteries and the manner of their operation furnished by the affiant on the basis of his personal experience. There are three kinds of lotteries—day and night house, which is played daily except Sunday; dog house, which is played only on Saturday (bets may be placed on other days, of course, but the number comes up on Saturday); and the Puerto Rican lottery, based on the legal lottery played in Puerto Rico, in which the number comes up on Wednesday only. The pattern of play indicated by the personal experiences of the officers and informants indicated

23. Memorandum entitled "The Need for the Taps," filed on behalf of the defendants by James J. Hogan.

that the dog house and Puerto Rican lotteries were the more heavily played. Thus, the business under investigation is revealed as highly cyclical, with peaks every Wednesday and Saturday.

This background reveals an unmistakeably significant pattern in the telephone toll calls recited in the affidavit. For the calls follow exactly the same daily pattern as is shown to exist in the lottery business itself, with the overwhelming majority of calls placed on Wednesdays and Saturdays.

The toll records show a heavy incidence of calls placed to three numbers— the telephone of Lee and Lillian Lockett, that of George and Mary (Tiny) Williams, and that of Catherine Williams. The affidavit clearly establishes probable cause to believe that the first two couples listed were then engaged in the lottery business. It may be that it does not reveal sufficient cause independent of the telephone calls with respect to Catherine Williams; however, it does provide ample reason to consider that she may be in the business, and to believe that she indeed is in the business if other evidence which confirms the activities of the Simons, the Locketts and the George Williams', also points to her in precisely the same manner.

Between February 3 and April 25, 1971, the latest dates for which the company then had records, 76 telephone calls were placed from the Simon telephone to the three other telephone in question. Thirty-four (34) were made to the Lockett telephone; 25 to the George and Mary Williams telephone; and 17 to the Catherine Williams telephone. Of these, 40 were made on Wednesdays and another 19 on Saturdays, for a total of 59, or 78% of the total calls, on those two days of the week. Even if the Catherine Williams calls are excluded, the identical pattern is shown. Fifty-nine (59) calls were made to the other two numbers, of which 27 were on Wednesday and 18 were on Saturday, for a total of 45, or 76% of the total. The figures further show that the two numbers other than the Lockett telephone were almost never called on any day other than Wednesday or Saturday. The Catherine Williams telephone was called only three times other than on Wednesday or Saturday; the George Williams telephone only twice.

When the calls are examined by dates, it is revealed that there were long periods, twice for as long as three weeks, when no calls whatever were made on any day but Wednesday and Saturday.[24] The patterns of calls were sufficient to entitle a judge to reach the conclusion that the traffic between the Simon telephone and those of the Locketts and the two Williams families was definitely connected with the lottery business, and that the calls were being placed for the purpose of carrying on the business by laying off wagers, providing numbers information, or other similar activities and further, that the Locketts and Catherine Williams were principally involved with the Puerto Rican lottery, and George and Mary Williams with the dog house, a conclusion further bolstered by the record of sales recounted elsewhere in the affidavit.

The allegations in the affidavit of need for monitoring would seem clearly to be sufficient for the purposes set out in the affidavit. The defendants' memorandum itself demonstrates the need. Though, to be sure, probable cause for the arrest of Janie Simon and certain others may have existed, it cannot be supposed that there was the faintest reason to think that the trail ended there. By its very nature, a lottery enterprise of any scale whatever involves a hierarchical conspiracy. It is highly secretive, as the account of the difficulties faced by all of the investigative officers

---

24. Between February 12 and March 4, there were 10 Wednesday calls and 9 Saturday calls, but none on any other day of the week. Similarly, between March 23 and April 11, there were 11 Wednesday calls and 4 Saturday calls, with none on any other day.

and, in particular, by the Bartow policeman, in even placing bets demonstrated. But even though they were able, through concentrated investigation and extensive use of informants and undercover investigation, to penetrate the first layer of the operation, they clearly had no information concerning from where the numbers information came to people such as the Simons, where the financing originated, to whom bets were turned in, and other similar aspects of the case. Plainly normal investigative methods had ceased to be effective once the bottom layer of the hierarchy was reached. To suppose that the investigation should have been terminated once the bottom of the ladder had been found, once the persons who took individual wagers had been identified, is unrealistic. These are but the tip of the iceberg; they can always be replaced. To root out the offense, those who are ultimately responsible for its existence and organization must be found, and the affidavit amply demonstrates that this would be impossible by any means other than by using monitoring to observe the actual transaction of business between the sellers and their superiors.

## V. WHETHER DISCLOSURE OF THE CONTENTS OF THE INTERCEPTIONS TO THE SPECIAL FEDERAL GRAND JURY VIOLATED THE PROVISIONS OF 18 U.S.C. §§ 2510–2520.

Defendants argue that 18 U.S.C. § 2518(9) prohibits the disclosure of the contents of the intercepts to a grand jury unless the parties are furnished with copies of the applications and court orders ten days beforehand. At the outset, it should be observed that both the federal and state wiretap statutes explicitly provide for disclosure of such evidence to state and federal grand juries. 18 U.S.C. § 2517(3); [25] Florida Statutes § 934.08(3), F.S.A.[26] The sole issue is whether disclosure to the special federal grand jury in this case is subject to the requirements of 18 U.S.C. § 2518(9), which provides in part:

> The contents of any intercepted wire or oral communication or evidence derived therefrom shall not be received in evidence or otherwise disclosed in any trial, hearing, or other proceeding in a Federal or State court unless each party, not less than ten days before the trial, hearing, or proceeding, has been furnished with a copy of the court order, and accompanying application, under which the interception was authorized or approved.

The Court concludes that it is not.

The requirements of the statute apply to "any trial, hearing, or other proceeding in a Federal or State court." In contrast, § 2517(3) authorizes disclosure

25. 18 U.S.C. § 2517 originally provided:
(3) Any person who had received, by any means authorized by this chapter, any information concerning a wire or oral communication, or evidence derived therefrom intercepted in accordance with the provisions of this chapter may disclose the contents of that communication or such derivative evidence while giving testimony under oath or affirmation in any criminal proceeding in any court of the United States or of any State or in any Federal or State grand jury proceeding.
The phrase "any criminal proceeding . . . or in any Federal or State grand jury proceeding" was changed to read "any proceeding" by Pub.L.No. 91–452, Title IX, § 902(b). The legislative history shows, however, that the change was intended to authorize disclosure in civil as well as criminal proceedings, not to destroy the distinction between court proceedings and grand jury hearings. Senate Report No. 91–1549, U.S.Code Cong. & Admin. News, p. 4036 (1970).

26. Fla.Stat. § 934.08, F.S.A. provides in part:
(3) Any person who has received, by any means authorized by this chapter, any information concerning a wire or oral communication or evidence derived therefrom intercepted in accordance with the provisions of this chapter may disclose the contents of that communication or such derivative evidence while giving testimony under oath or affirmation in any criminal proceeding in any court of the state or in any grand jury proceeding, if such testimony is otherwise admissible.

"in any criminal proceeding in any court . . . *or* in any Federal or State grand jury proceeding." (Emphasis added). This language would indicate that the framers of this statute considered a grand jury as something other than a "proceeding" in court. The legislative history is more explicit:

"Proceeding" is intended to include all adversary type hearings. It would include a trial itself, a probation revocation proceeding, or a hearing on a motion for reduction of sentence. It would not include a grand jury hearing. Senate Report No. 1097, *supra*, at p. 2195.

This congressional intent has been acknowledged and followed by at least two circuits [United States v. Friedland, 444 F.2d 710 (1st Cir. 1971); United States v. Gelbard, 443 F.2d 837 (9th Cir. 1971)] and this Court is not prepared to reject it.

## VI. WHETHER THE USE OF THE "PEN REGISTER" CONSTITUTED A GENERAL SEARCH IN VIOLATION OF THE FOURTH AMENDMENT.

The defendants argue that the device known as a "pen register" intercepts communications as defined in 47 U.S.C. § 605 [27] and 18 U.S.C. § 2510.[28] The defendants cite United States v. Dote, 371 F.2d 176 (7th Cir. 1966) and United States v. Caplan, 255 F.Supp. 805 (E.D. Mich.1966) for the proposition that the use of a pen register is an interception of a "communication" and thereby prohibited by 47 U.S.C. § 605. On the other hand, the present case law indicates that the pen register is not an interception of communication within 18 U.S.C. § 2510(4) and not subject to the strict requirements of § 2518. United States v. King, 335 F.Supp. 523 (S.D.Cal. 1971); United States v. Vega, 52 F.R.D. 503 (E.D.N.Y.1971); United States v. Escandar, 319 F.Supp. 295 (S.D.Fla. 1970).

Initially, it is noted that the phrase, "any communication," in the second clause of 47 U.S.C. § 605, which *Dote* and *Caplan* construed to include the print out of dialed phone numbers by the pen register, no longer appears in that statute. The phrase was changed to "any radio communication" by Public Law No. 90-351, Title III, § 803, the same law which enacted Title 18, Chapter 119 (§§ 2510-2520). In addition, § 803 prefaced § 605 with the phrase, "Except as authorized by chapter 119, Title 18

---

27. As originally enacted, 47 U.S.C. § 605 provided:

No person receiving or assisting in receiving, or transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, . . . or in response to a subpena (sic) issued by a court of competent jurisdiction, or on demand of other lawful authority; and no person not being authorized by the sender shall intercept *any communication* and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. (Emphasis added).

As amended in 1968, the statute now reads:

§ 605. Unauthorized publication or use of communications. Except as authorized by chapter 119, Title 18, no person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect or meaning thereof, except through authorized channels of transmissions or reception, . . . (5) in response to a subpena (sic) issued by a court of competent jurisdiction, or (6) on demand of other lawful authority. No person not being authorized by the sender shall intercept *any radio communication* and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. (Emphasis added).

28. As defined in 18 U.S.C. § 2510(4): "intercept" means the aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical, or other device.

**422**

. . . ." The legislative history of this change makes it clear that Congress intended that the regulation of interception of *wire* communications would be governed solely by the new chapter 119. 7 U.S.Code Cong. & Admin.News p. 2196 (1968). Therefore, since only wire communications are involved in the present taps, 47 U.S.C. § 605 does not apply. There still exists, however, a conflict between the logic and positions of *Dote* and *Caplan,* and the decisions in *King, Vega,* and *Escandar.*

 Paragraph (4) of 18 U.S.C. § 2510 defines "intercept" as the "aural acquisition of the *contents* of any wire or oral communication." The Senate report shows that this was not intended to prevent the tracing of calls or the use of a pen register. This Court concludes that this language was intended to exempt pen registers when used alone from the warrant requirements of § 2518. The Court does not reach the issue of whether such use is subject to the first sentence of amended 47 U.S.C. § 605, in which case *Dote* and *Caplan* may still be efficacious. The holding here is that the pen register, when used in conjunction with a court-ordered wiretap, is an interception of wire communication and, to that extent, the Court disagrees with *King, Vega,* and *Caplan.* To be more precise, the pen register intercepts the same signal picked up by the tape recorder. Both are activated when the receiver is lifted off the hook or when an incoming signal reaches the tapped phone. The only difference is that the pen register relays a different interpretation of the intercepted signal to the monitoring party. While the audio tape recorder translates the signal into recorded sound, the pen register simply translates the same signal into a visual printout. Thus, the Orders Authorizing the Interception of Wire Communication in this case are sufficient to permit the use of the pen register in conjunction with those interceptions.

 Defendants also argue that the use of the pen register is a general search since it seizes everything on the wire in violation of the Fourth Amendment. The Court does not agree. Both the pen register and the tape recorders are activated at the same time; both "record" the dialing or ringing of the phone. After the call is placed, the tape recorder continues to intercept and the agents continue to monitor for the purpose of determining whether the conversation is pertinent. Meanwhile, the pen register has already automatically terminated its "interception." It recorded no more than the dialing or the ringing of the phone. If the limited monitoring of the tape recorder for minimization purposes is permissible under the statute and the Fourth Amendment, it is difficult to see how the even more limited interception by the pen register is not permissible.

For all of the reasons stated, the defendants' motion to suppress, to the extent that it is based on the foregoing arguments, is hereby *pro tanto* denied.