Charles J. Hannigan, J.
This decision relates to pretrial motions which were filed, argued, and decided prior to the jury trial of this indictment. The jury trial resulted in the conviction of two defendants, the acquittal of two others, and disagreement with respect to the fifth. This disagreement resulted in the dismissal of the charge against this defendant.
For the most part, the pretrial motions (although voluminous) did not present any novel questions of law which would require a written decision. However, two arguments, which were presented, for suppression of the wiretap evidence would warrant a written explanation.
The defendants, contend, first, that the Canadian authorities wiretapped without a court order, intercepting calls originating in the United States, from Silvio Martelli. Thus, the defendant claims a violation of the Constitution, i.e., an illegal search and seizure, which would require suppression.
After the information concerning bookmaking by Silvio Martelli was imparted to United States officials, by Canadian police officers, they sought and received an eavesdrop order for the phone of Silvio Martelli. The application by the District Attorney states there is probable cause to believe Martelli is committing the crime of promoting gambling, second degree. The eavesdrop order also states that this is the particular crime which is being investigated. The defendants argue that promoting gambling, second degree is a misdemeanor, and that the United States Code (tit 18) and the Penal Law of New York do not authorize intercepts for misdemeanors. The intercept order therefore, they suggest, is invalid, and the evidence gathered thereunder must be suppressed.
In order to fully understand the afore-mentioned contentions, a factual narrative of this gambling investigation is set forth.
Canadian police officials were conducting an investigation of gambling activities within their jurisdiction. They had employed eavesdrop devices to assist them in this endeavor. It is of no significance to this court, whether these interceptions *387 were pursuant to court order; but, for purposes of this decision, it is presumed that there was none.
There is no reason to believe that the Canadian investigation of Canadian nationals was in any way inspired or under the aegis of the United States law enforcement agencies. During the course of gathering information, via wiretap devices, the Canadian authorities became aware that the Canadian bookmakers were laying-off or placing bets with Silvio Martelli on the American side of the border. Corporal Riley, of the Ontario Provincial Police, advised Detective Billy H. George of the Niagara Falls Police Department that they had intercepted calls to and from Silvio Martelli at a telephone numbered 282-4122 in Niagara Falls, New York. In addition, the Canadian authorities supplied Detective George with transcripts and summaries of the intercepted conversations from the Canadian telephone.
The Niagara Falls Police Department learned that the telephone (282-4122) was located in Lum’s Restaurant (also known as Silvio’s) and that Silvio Martelli was the manager of the restaurant. The telephone was listed in the name of Martelli Enterprises, Inc. Physical surveillance of the restaurant established that Silvio Martelli worked in the restaurant, and had access to the telephone.
It did not require any extensive expertise to conclude from the transcripts that the Canadian subject, under investigation, was a bookmaker, and that he was receiving bets from and forwarding bets to Silvio Martelli in Niagara Falls, New York.
All of this information, and more, was presented to Ann T. Mikoll, a Justice of the Supreme Court, on November 20, 1973. The District Attorney requested an eavesdrop warrant to gather evidence concerning the commission of the crime of promoting gambling in the second degree. The Justice found reasonable cause to believe that crime was being committed, and authorized the installation of the device.
As a result of this order, telephone calls were intercepted on November 24, 1973 to November 27, 1973. It soon became apparent to the detectives, who were monitoring the intercept, that Silvio Martelli was accepting bets for, and laying-off bets with, his "Uncle Pete.” The police officers were aware that Peter Magliarditi was, in fact, the uncle of Silvio Martelli. They were also familiar with his voice, and were able to make voice identification.
The officers monitoring counted the "clicks” from the outgo *388 ing calls from Martelli’s phone, and learned that he was calling "Uncle Pete” at two telephones (284-4425 and 284-9207). The telephone company records revealed that both phones were located at one residence on 16th Street, registered to Joan Myrtle and Kathryn Myrtle. Both telephones were installed in one apartment; although the subscribers were not the same. Physical surveillance of the apartment revealed the presence of Peter Magliarditi.
The transcripts of the intercepted calls (which were subsequently presented to Justice Frank Kronenberg) revealed that Silvio Martelli was accepting wagers on horses and sports action, and was relaying these bets to various bookmakers, principally his "Uncle Pete.”
The transcripts of Silvio Martelli’s conversations on November 25, 1973 alone (which were later presented to Justice Kronenberg) show that on that date, he accepted $1,670 in bets from "Mike,” and laid-off a portion of these bets with "Uncle Pete.”
This information was put into affidavit form, signed by Aldo L. Di Florio, District Attorney, and Detective Billy George. Transcriptions of the telephone calls from Silvio Martelli’s restaurant were attached, and an application was made to Justice Frank J. Kronenberg on December 10, 1973 to intercept the calls upon the two telephones listed to the Myrtle girls on 16th Street, upon the premise that these telephones were being used by Peter Magliarditi to commit the crime of promoting gambling in the second degree. Justice Kronenberg’s order states that he authorizes intercept of these phones for the purpose of gathering evidence of the commission of this crime, viz.: promoting gambling in the second degree.
Pursuant to this order, Detective George installed an intercept device on telephone 284-9207 on December 14, 1973. Surveillance of this intercept on the following date, December 15, 1973 revealed more than 100 calls relating to gambling, during which calls more than $5,000 were accepted as wagers by Peter Magliarditi and John Ciccone. During the course of this monitoring, the police became aware that Magliarditi and Ciccone were receiving and laying-off bets with other known gamblers, including Joseph Botella, Charles Ogrodowski and John Magliarditi. One conversation, alone, concerned the accepting of $2,500 bet on a National League football game.
This information, along with transcripts of conversations on *389 December 15, 1973, was presented to Justice Kronenberg, in affidavit form, on December 21, 1973, wherein the District Attorney requested a continuation of the December 10, 1973 order to allow for the gathering of evidence of the commission of the crime of promoting gambling in the first degree. The order extending and amending the previous intercept order of December 10, 1973 was signed on December 21, 1973.
Peter Magliarditi, a careful practitioner of his profession, meanwhile, was in the habit of changing locations and telephones about as often as most other people change their socks. He had moved his operation to a new location on 2nd Street, and had the telephones (284-0510 and 285-7164) installed in the name of Duncan Coutts.
Not to be outdone by such maneuverings, the District Attorney and Detective George again visited Justice Kronenberg with new affidavits and more transcribed conversations. Their affidavits reflected that Peter Magliarditi was now a regular visitor to the Coutts apartment, and that he was giving out the new telephone number during his conversation on the phone which was tapped at the Myrtle residence.
Justice Kronenberg signed his third intercept order on January 2, 1974, authorizing interception of communications over 284-0510 and 285-7164 to gather evidence of the crimes of conspiracy to commit promoting gambling in the first degree, and promoting gambling in the first degree. The intercept was installed and continued for the period beginning January 8, 1974 and terminating on January 14, 1974.
With this historical analysis behind us, we can return to the contentions of the defendants.
First, they contend that the constitutional rights of Silvio Martelli were violated by Canadian authorities by intercepting his telephone calls to Canadians at telephones in that country. We presume that such interception, for purposes of argument, was not pursuant to court order, or title 18 of the United States Code. The defendants, therefore, conclude that Mapp v Ohio (367 US 643) coupled with Wong Sun v United States (371 US 471) would mandate that the "fruits” of that seizure be suppressed.
The problem that faces the defendants here is that they are attempting to take advantage of the constitutional rights of another, which are personal to him. Silvio Martelli could make this argument. The defendants cannot. They have no *390 standing. (People v Cefaro, 21 NY2d 252, revd and remanded on other grounds 23 NY2d 283.)
Silvio Martelli has entered a plea of guilty to a lesser included charge following plea bargaining with the District Attorney, and is not a party to this proceeding.
The second problem area facing the defendants here is that they have failed to show any reason why the Constitution or the United States Code should be given extraterritorial effect. There is no showing that the Canadian investigation was at the request of the Niagara Falls Police Department, or that they participated in it, other than to receive the product of the investigation at its termination.
This issue was determined in Brulay v United States (383 F 2d 345, cert den 389 US 986). In that case, the Mexican authorities had concededly illegally seized a ton or so of amphetamine tablets which were produced as evidence against the defendant at his trial. He suggested that they should be suppressed. The court ruled (p 348): "The Fourth Amendment is directed at the Federal Government and its agencies. Fourth Amendment rights are protected from state encroachments by the Fourteenth Amendment which reaches the states and their agencies. The Fourth Amendment does not, by its language, require the exclusion of evidence and the exclusionary rule announced in Weeks is a court-created prophylaxis designed to deter federal officers from violating the Fourth Amendment. Neither the Fourth nor the Fourteenth Amendments are directed at Mexican officials and no prophylactic purpose is served by applying an exclusionary rule here since what we do will not alter the search policies of the sovereign Nation of Mexico.”
We turn now to the question that since the application and order of Justice Kronenberg, dated December 10, 1973, authorized interception to gather evidence of the commission of the crime of promoting gambling in the second degree, the subsequent orders, dated December 21, 1973 and January 2, 1974 expressly stated that the subject of the investigation was the commission of the crime of promoting gambling in the first degree.
The defendants contend that since promoting gambling in the second degree is a class A misdemeanor, that the Justice was not authorized to issue the eavesdrop order, and that it is void. Since the order was issued in violation of statutory *391 authority, they argue, the product of the eavesdrop must be suppressed.
The defendants’ contention is not valid for the following reasons:
The defendants have misconstrued the statute in suggesting that the crime under investigation must be a felony, or carry a sentence in excess of one year. This is true only if the crime under investigation is not one of the crimes enumerated. Subdivision (2) of section 2516 of title 18 of the United States Code, which is the authorizing legislation, reads as follows: "The principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof, if such attorney is authorized by a statute of that State to make application to a State court judge of competent jurisdiction for an order authorizing or approving the interception of wire or oral communications, may apply to such judge for, and such judge may grant in conformity with section 2518 of this chapter and with the applicable State statute for an order authorizing, or approving the interception of wire or oral communications by investigative or law enforcement officers having responsibility for the investigation of the offense as to which the application is made, when such interception may provide or has provided evidence of the commission of offense of murder, kidnapping, gambling, robbery, bribery, extortion, or dealing in narcotic drugs, marihuana or other dangerous drugs, or other crime dangerous to life, limb, or property, and punishable by imprisonment for more than one year, designated in any applicable state statute authorizing such interception, or any conspiracy to commit any of the foregoing offenses.” (Italics supplied.)
The defendants would read the italicized phrase "and punishable by imprisonment for more than one year” as modifying the generic crimes which were mentioned, such as murder, gambling, and robbery. This is a contortion of the English language, and the plain meaning of the statute. The plain meaning of the enabling legislation is that if the crime under investigation is within one of the enumerated generic criminal activities (i.e.j murder, gambling, robbery, etc.); then, interception may be authorized. If the crime under investigation does not fit within one of the categories; then, it must be shown that the "other crime” is (1) dangerous to life, limb or property, and (2) punishable by imprisonment for more than one *392 year, and (3) designated in any applicable State statute authorizing such interception.
This meaning is apparent, from a review of the legislative history, the Crime Control Act of 1968. The legislative history reads as follows: "The interception of wire or oral communications by State law-enforcement officers could only be authorized when it might provide, or has provided evidence of designated offenses. (See McNally v. Hill, 55 S. Ct. 24, 293 U.S. 131, 136 (1934).) Speciñcally designated offenses include murder, kidnapping, gambling, robbery, bribery, extortion, or dealing in narcotic drugs, marihuana, or other dangerous drugs. All other crimes designated in the State statute would have to be dangerous to life, limb, or property, and punishable by imprisonment for more than 1 year. ’ This limitation is intended to exclude such offenses as fornication and adultery, which do not involve danger to life, limb, or property.” (90th Cong, Sen Report No. 1097, US Code Cong & Admin News, vol 2, p. 2187; emphasis supplied.)
The broad scope of the authorization to State officials to apply for intercepts, as reflected in the Senate Report, was a cause of concern to Senator Hart, who wrote his view of the legislation, as an addendum to the report. "It is hard to conceive how the range of State offenses for which such a serious invasion of privacy as wiretapping is authorized could be broader than the Federal offenses, but such is the case.
"Section 2516(2) permits wiretapping and eavesdropping for any state crime punishable by more than one year in prison and dangerous to 'life, limb or property.’ Nothing in Section 2516(2) thus prohibits the use of bugging or tapping in such sensitive areas as state income tax violations.
"Likewise in many states numerous petty offenses will qualify under Section 2516(2) as crimes for which wiretapping and bugging orders may be issued.” (US Code Cong & Admin News, Additional views of Mr. Hart, p 2235.)
This same suggestion was presented to the Federal District Court, and was rejected. The court interpreted the statute, in conformity with the legislative history, by holding that "gambling” was a specified offense, and that the limiting terms that followed, relating to terms of imprisonment did not apply to the generic offenses enumerated in the statute. "This court also holds that the offenses enumerated in 18 USC 2516(2) can be the subject of a state wiretap investigation whether or not they are designated in the applicable state statute, but any *393 other offense would have to be designated in the state statute in order to be investigated by electronic surveillance.
"In accord with this court’s view of the intent of Congress in enacting Sec. 2516(2), I hold that the phrase therein, 'designated in any applicable State statute authorizing such interception; modifies only the preceding phrase commencing 'or other crime dangerous to life * * * ’ and not the offenses enumerated thereto before.
"The application of the State’s attorney for the wiretap order in this case and the affidavits in support thereof alleged that there was probable cause to believe that the gambling laws of Maryland were being violated and that a conspiracy existed to violate such laws. Gambling is one of the 'specifically designated’ offenses in Title III. Therefore, the defendant’s contention on this point is without merit.” (United States v Curreri, 16 Cr L 2288, 2289; see, also 388 F Supp 607.)
A similar result was reached in United States v Lanza (341 F Supp 405, 412-413, rearg 349 F Supp 929 and 356 F Supp 27).
It is apparent that the New York State Legislature adopted this clear meaning of the Crime Control Act, in passing its own enabling legislation. CPL 700.05 (subd 8) enumerated the felonies for which intercepts may be authorized. It then details additional felonies, and misdemeanors (including promoting gambling in the second degree as defined in Penal Law, § 225.05) as an offense which may be the subject of a wiretap order. (CPL 700.05, subd 8, par [c].) The New York statute had been held by the Second Circuit to conform to the Federal law, and is constitutional. United States v Tortorello (480 F 2d 764), which involved a State ordered wiretap, yielding evidence of Federal crimes, and resulting in Federal prosecution and conviction.
It is noteworthy, in this case, to point out that the peculiar circumstances here would also have authorized an intercept order on the Federal level.
The conversations supplied by the Canadian police to Detective George show evidence of gambling on an international level. This would have justified the issuance of an intercept warrant to investigate the commission of the offense of gambling as defined in subdivision (a) of section 1084 of title 18 of the United States Code.
The Attorney General is specifically authorized to apply for *394 an intercept order to investigate this offense. (US Code, tit 18, § 2516, subd [1], par [c].)
Additionally, although the first two applications and intercept orders specified only the offense of promoting gambling in the second degree, the information presented to the issuing Justices could lead them to the reasonable conclusions that violations of sections 225.00 through 225.40 of article 225 of the Penal Law were being committed. (See United States v Mainello, 345 F Supp 863, 872.)
This case, involving wiretaps in a gambling investigation, held that continuation of the taps for a period of 50 days was not excessive. (Mainello, supra, p 873.) This is far in excess of the amount of monitoring that was present in this case.
Having presided at the trial of this case, I find that there was a good-faith effort to minimize the interception permitted by the four court orders. All of the officers testified that they did not monitor nonpertinent calls. (See United States v Manfredi, 488 F 2d 588.)
The motion to suppress is denied.