UNITED STATES of America, Plaintiff,

v.

Douglas VAN HORN, et al., Defendants.

UNITED STATES of America, Plaintiff,

v.

Joseph J. BONGIORNO, et al., Defendants.

UNITED STATES of America, Plaintiff,

v.

Ronald J. BARTREM, et al., Defendants.

UNITED STATES of America, Plaintiff,

v.

Donald E. BIERMAN, Defendant.

CR 83–0–54 to CR 83–0–57.

United States District Court, D. Nebraska.

Jan. 30, 1984.

Thomas D. Thalken, Bernard Glaser, Stephen Anderson, Omaha, Neb., for the United States.

J. William Gallup, Omaha, Neb., for Brad Smith, Russell Rockwell, Irene Rothe, & Richard Incontro.

Donald B. Fiedler, Omaha, Neb., for Joseph Bongiorno, and Lawrence Barton.

Ronald E. Frank, Omaha, Neb., for Marie Bongiorno.

Robert C. Wester, Papillion, Neb., for Francis Warner.

Michael L. Schleich, Omaha, Neb., for Donald Bierman.

Robert Francis Cryne, Omaha, Neb., for Robert Carroll.

Ralph A. Smith, Martin J. Kushner, Omaha, Neb., for Neil Holmes.

S.J. Albracht, Omaha, Neb., for Royal Cover.

Dennis E. Martin, Omaha, Neb., for James Willy.

Raymond Hasiak, Omaha, Neb., for Mary Lou Whitfield Williams.

Barbara Thielen, Omaha, Neb., for Timothy DeWitt.

## MEMORANDUM AND ORDER

BEAM, District Judge.

These matters are before the Court upon defendants' objections to the Magistrate's Findings and Recommendations (filings 109 and 112 in CR 83-0-53; filings 177 and 183 in CR 83-0-54; filings 167, 169, 171, 174 and 180 in CR 83-0-55; and filing 22 in CR 83-0-57). Motions to suppress evidence obtained by interception of wire and oral communications have been filed in CR 83-0-53 by defendants Barton and Holmes; in CR 83-0-54 by defendants Joseph and Marie Bongiorno, and Mark and Wayne Womochil; in CR 83-0-55 by defendants Carroll, Cover, DeWitt, Warner, Williams, and Willy; and in CR 83-0-57 by defendant Donald E. Bierman. The motions were consolidated and referred to United States Magistrate Peck for findings and recommendations under 28 U.S.C. § 636(b)(1)(B) and (C).

An evidentiary hearing was held before the Magistrate on October 25 and 26, 1983. On November 14, 1983, the Magistrate entered an order recommending that all motions to suppress be denied (*see, e.g.,* filing 103 in CR 83-0-53). This Court is required, under 42 U.S.C. §§ 405(g) and 1383(c)(3), to review the findings and recommendations, as well as the motions, briefs, affidavits and other evidence filed, served or adduced in this matter, *de novo.*

With the exception of defendant Bierman, the above-named defendants have been indicted on charges of (1) conspiracy to distribute cocaine in violation of 21 U.S.C. § 846; (2) distribution and possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1); and (3) use of the telephone to facilitate distribution of cocaine in violation of 21 U.S.C. § 843(b). Defendant Bierman is charged with possession with intent to distribute cocaine under 21 U.S.C. § 841(a)(1).

The indictments were returned as a result of information gathered during a three-year investigation of illegal narcotics distribution in the Omaha area. The investigation was initiated by the Omaha Police Department [hereinafter OPD]. Subsequently, members of the Douglas County Sheriff's Office, the Nebraska State Patrol, and the Federal Bureau of Investigation [hereinafter FBI] became involved. Sergeant Verlyn Sieh of the OPD coordinated the investigation. After the FBI became involved in July of 1982, Sergeant Sieh was assisted by Special Agent Thomas Murphy.

At the evidentiary hearing, Special Agent Murphy and Sergeant Sieh testified that the investigation (sometimes referred to as Operation Zookeeper) was designed to gather information leading to the arrest and conviction of "king pin" suppliers of cocaine. Traditional investigative techniques had, apparently, identified several persons engaged in the selling of narcotics, but the ultimate suppliers had not been identified.

Investigative forces first utilized electronic surveillance on July 13, 1982, upon authorization by a Douglas County, Nebraska, District Judge. The affidavits supporting the application for wiretaps were submitted by the County Attorney for Douglas County, Nebraska. The way in which cocaine is allegedly smuggled into this country from South America, diluted, and sold through a multi-level distribution network was described. The affidavit recited in detail the information already obtained from informants whose reliability had been established, undercover police officers, surveillance, and by authorized hookups of pen register devices.

The affidavit concluded that the information provided probable cause to believe that defendant Bartrem [1] and others "known and unknown" were engaged in conspiratorial activity relating to the unlawful distribution of the narcotic cocaine, and that telephones at the Brass Knocker Lounge (3012 North 102nd Street), Sunset Auto Sales (1739 South 13th Street), defendant Bartrem's apartment (5123 North 93rd Avenue) and the Prosthetic Dental Laboratory (3024 North 102nd Street) in Omaha were being utilized. The affidavit recited specific instances where conventional investigative techniques had failed to identify the scope of the conspiracy and the ultimate suppliers of the narcotics involved, and that conventional techniques could not be expected to provide this kind of information in the future.

> Your affiant, based on the foreoing (sic) has formed an opinion that normal police investigative methods such as surveillance, use of informants and confidential sources, pen register devices, and the use of undercover officers has been tried by the officers and these methods have met with failure and reasonably appear to be unsuccessful in the future in gathering a sufficient amount of evidence to prove Ronald Bartrem and his associates are involved in a conspiracy to distribute controlled substance, or in identifying and prosecuting the source of these controlled substances.

The affiant suggested that investigatory experience had shown that the missing links in the chain of supply could be identified through the use of electronic surveillance.[2]

Authorization was requested for interception of both incoming and outgoing calls of defendant Bartrem on Omaha number 572–1159 at Bartrem's residence; Omaha numbers 572–9400 and 572–9597 at the Brass Knocker Lounge; Omaha numbers 341–3464 and 341–3465 at Sunset Auto

---

1. On November 4, 1983, defendant Bartrem pleaded guilty to the conspiracy count in CR 83–0–54 and the substantive charge of distribution in Count VI of CR 83–0–55.

2. Normal investigative methods have also failed in positively identifying the source of Ronald Bartrem and his associates illegal controlled substances. The method that has been success- ful in the past in gathering a sufficient amount of evidence against all the individuals involved in this particular type of drug operation and in identifying and prosecuting the source of the illegal drugs has been the interception of oral or wire communications over telephones utilized by primary individuals involved.

Sales; and Omaha number 571–7007 at the Prosthetic Dental Laboratory. Interception was to continue for a period of thirty days from the date of hookup. Because of the continuing nature of the alleged offenses, the affiant requested that surveillance continue after initial drug-related calls had been intercepted.

The Judge, in an order granting the application for wiretaps, found sufficient probable cause to believe that the telephone numbers enumerated were being used to facilitate the unlawful sale of cocaine. The Judge noted that normal investigative procedures had been tried and had failed. The order specified that both state and [deputized] federal officers were authorized to make the interceptions, and directed the officers to minimize interceptions not related to the charges under investigation. The order provided that interception continue after drug-related calls were first monitored.

Upon application supported by affidavit, orders authorizing thirty-day extensions for interception of Bartrem telephone conversations were entered on August 12, September 10, October 19, and November 17 of 1982.

In monitoring the calls, law enforcement officials took the following precautions in an attempt to comply with the law. FBI agents utilized in monitoring the telephone calls were deputized by the Governor of the State of Nebraska and designated "State Sheriffs." All monitoring personnel were instructed as to established minimization procedures designed to preserve the privacy of calls unrelated to the trafficking of cocaine. Those procedures included a directive that monitoring cease after sixty seconds unless the call was related to the sale of cocaine. During intervals not covered by wiretap orders from the Douglas County District Court, the monitoring machines were disconnected and instructions

not to monitor were placed over the machines.

An affidavit/application similar to the one described above was filed by the Douglas County attorney on July 29, 1982, seeking authority to place an electronic device [hereinafter "bug"] in defendant Bartrem's apartment and at the Prosthetic Dental Laboratory. The "bugs" were placed for the monitoring of the oral communications of Bartrem and Bongiorno concerning the sale of cocaine. The affiant stated that telephone intercepts had failed, and would most likely continue to fail to identify the sources of supply. An order was issued authorizing use of the bug for thirty days. Orders for continued use of the device were issued up through a thirty-day period ending on November 28, 1982.

After the "bugs" were placed, subsequent affidavit/applications were submitted for various wiretaps on the phones of Harry Gilbert and Joseph Bongiorno which taps allegedly implicate the present defendants in the unlawful purchase and/or distribution of cocaine.

The questions of law presented to the Court are (1) whether agents of the FBI were authorized to monitor the wiretaps; (2) whether state and/or federal law controls the issuance of the wiretaps; (3) whether there was probable cause to believe that unlawful drug transactions were being conducted over the phone lines in question; and (4) whether the government violated Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–20 and *Neb.Rev.Stat.* §§ 86–701 through 86–707 (Reissue 1976) by (a) failing to terminate the interceptions after drug-related calls were first detected; (b) failing to take steps to minimize the incidents of electronic surveillance; and (c) failing to adequately utilize traditional methods of investigation before applying for a wiretap.

The Nebraska wiretap statute,[3] section 86–703, provides, *inter alia*, that "the

---

**3.** Defendants Carroll and Willy argue that *Neb. Rev.Stat.* §§ 86–701 through 712 (Reissue 1981) is unconstitutional. The constitutionality of the federal wiretap law, 18 U.S.C. §§ 2510–2520, has

been decided. *United States v. John,* 508 F.2d 1134, 1137 (8th Cir.), *cert. denied,* 421 U.S. 962, 95 S.Ct. 1948, 44 L.Ed.2d 448 (1975). In *State v. Kolosseus,* 198 Neb. 404, 253 N.W.2d 157 (1977),

Court may grant an order authorizing or approving the interception of wire or oral communications by law enforcement officers having responsibility for the investigation of the offense as to which application is made." Section 86–701(5), provides the following definition of "officer":

Investigative or law enforcement officer shall mean any officer of the State of Nebraska or political subdivision thereof, who is empowered by law to conduct investigations of or to make arrests for criminal offenses, and the Attorney General and any county attorney authorized by law to prosecute or participate in the prosecution of such offenses.

The defendants interpret these provisions to mean that the Nebraska statute prohibits any use of federal officers in investigations involving state wiretap authorizations. The Court does not agree.

■■■ First, it must be observed that the federal wiretap statute pre-empts state law pertaining to electronic surveillance. 18 U.S.C. § 2516(2); *United States v. Tortorello*, 480 F.2d 764, 772 (2d Cir.), *cert. denied*, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973); *see* Senate Report 1097, 90th Cong.2d Sess.1968, *reprinted in* U.S. Code Cong. & Admin.News 2112, 2180, 2187. In a federal prosecution, federal standards are to be applied in determining the admissibility of evidence. *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1966); *United States v. Collins*, 552 F.2d 243, 247 (8th Cir.), *cert. denied*, 434 U.S. 870, 98 S.Ct. 214, 54 L.Ed.2d 149 (1977); *in accord, Wolfle v. United States*, 291 U.S. 7, 54 S.Ct. 279, 78 L.Ed. 617 (1934); *United States v. Dudek*, 530 F.2d 684 (6th Cir.1976), *cert. denied*, 434 U.S. 1037, 98 S.Ct. 774, 54 L.Ed.2d 786 (1978), *reh. denied*, 434 U.S. 1089, 98 S.Ct. 1288, 55 L.Ed.2d 796 (1978). The Nebraska

the Nebraska Supreme Court observed that the Nebraska statute was virtually identical to its federal counterpart. Therefore, it is not necessary for this Court to determine the constitutionality of the state statute. *See United States v. Atkins*, 618 F.2d 443 (9th Cir.); *United States v. Edelson*, 581 F.2d 1290 (7th Cir.1978), *cert. denied*, 440 U.S. 908, 99 S.Ct. 1216, 59 L.Ed.2d 456 (1979).

Supreme Court has observed that the Nebraska wiretap statute is virtually identical to its federal counterpart. *State v. Kolosseus*, 198 Neb. 404, 253 N.W.2d 157 (1977), and persistently refers to federal cases when interpreting the Nebraska statute. *See, e.g., id.; State v. Golter*, 216 Neb. 36, 342 N.W.2d 650 (1983); *State v. Hinchion*, 207 Neb. 478, 299 N.W.2d 748 (1980); and *State v. DiMauro*, 250 Neb. 275, 287 N.W.2d 74 (1980). In a federal prosecution involving wiretaps authorized by a state court, suppression motions must be judged in light of federal law. *See United States v. Vazquez*, 605 F.2d 1269, 1280 n. 26 (2d Cir.), *cert. denied*, 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979); and *United States v. Howell*, 581 F.Supp. 65, 68 (D.Neb.1983). The federal statute does not prohibit joint investigations, and there has been no showing that Nebraska legislators intended to do so.

■■■ As *Neb.Rev.Stat.* § 86–703 makes clear, the Court is to grant orders for wiretaps to officers responsible for the investigation at hand. In the present case, the Governor of the State of Nebraska deputized each federal officer who participated in obtaining or monitoring the Zookeeper wiretaps. Such appointments are specifically authorized by *Neb.Rev.Stat.* § 84–106 (1981): "(t)he Governor is authorized to call to his assistance and appoint any number of persons necessary to assist the superintendent of law enforcement and public safety to enforce the provisions of the criminal laws." Therefore, the federal officers were properly cloaked with the indicia of state authority. The Court declines to engage in a hypertechnical construction of section 86–701(5) of the Nebraska Statute which would foreclose a joint state and federal investigation.[4]

4. Affidavits in support of an application for a wiretap order are to be read in a practical and common sense manner rather than hypertechnically. *United States v. Santarpio*, 560 F.2d 448, 453 (1st Cir.), *cert. denied*, 434 U.S. 984, 98 S.Ct. 609, 54 L.Ed.2d 478 (1977); *see also, United States v. Ventresca*, 380 U.S. 102, 108–09, 85 S.Ct. 741, 745–46, 13 L.Ed.2d 684 (1965) and

■ The defendants have asserted numerous arguments challenging the sufficiency of the applications and orders for the interception of oral and wire communications involved in the Zookeeper investigations. Some preliminary observations are in order. First, the supporting affidavits are presumed to be valid. *Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978). The burden of proof is on the defendant to establish the illegality of the wiretaps by a preponderance of the evidence. *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 267, 84 L.Ed. 307 (1939); *United States v. Evans,* 572 F.2d 455, 486 (5th Cir.), *cert. denied,* 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978) ("the burden is on the movant to make specific factual allegations of illegality, to produce evidence, and to persuade the Court that the evidence should be suppressed"); *see also, United States v. Phillips,* 540 F.2d 319, 325–6 (8th Cir.), *cert. denied,* 429 U.S. 1000, 97 S.Ct. 530, 50 L.Ed.2d 611 (1976).

■ In *Illinois v. Gates,* — U.S. —, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (police officers rely on facts related in anonymous letter to establish probable cause for a search warrant), the Supreme Court, through Justice Rehnquist, abandoned the standard of probable cause established in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) in favor of a totality of circumstances approach. *Gates,* as applied to wiretap cases, directs a judge or magistrate to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, there is a "fair probability" that the phone lines in question are being used for trafficking in illegal narcotics. *See id.* — U.S. at —, 103 S.Ct. at 2332. The affidavit/applications must be tested in a "practical and common sense fashion." *United States v. Jackson,* 549 F.2d 517, 537 (8th Cir.), *cert. denied,* 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977); *United States v. Kirk,* 534 F.2d 1262, 1274 (8th Cir.1976), *cert. denied,* 430 U.S. 906, 97 S.Ct. 1174, 51 L.Ed.2d 581 (1977). The Judge to whom the wiretap application is made is entrusted with broad discretion and the determination made is entitled to great deference. *United States v. Landis,* 632 F.2d 66, 68 (8th Cir.1980) (Lay, C.J.), *cert. denied,* 450 U.S. 918, 101 S.Ct. 1363, 67 L.Ed.2d 344 (1981); *United States v. Daly,* 535 F.2d 434, 437 (8th Cir.1976); *McCreary v. Sigler,* 406 F.2d 1264, 1268 (8th Cir.), *cert. denied,* 395 U.S. 984, 89 S.Ct. 2149, 23 L.Ed.2d 773 (1969).

■ In *United States v. Coffman,* CR 81–0–10, memo. op. (D.Neb. Aug. 27, 1981), Judge Schatz cogently set forth the elements required to find probable cause to support an order for electronic surveillance:

> Pursuant to both 18 U.S.C. § 2518(3) and *Neb.Rev.Stat.* § 86–705(3), a Judge may issue an order if on the basis of facts submitted by the applicant, a determination is made that there is (1) probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in the statute; (2) probable cause for belief that particular communications concerning that offense will be obtained through such interception, and (3) probable cause for belief that the facilities from which, or the place where, the wire or oral communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, or listed in the name of, or commonly used by such person.

Memo op. at 5. The issue of whether the requirements of probable cause have been complied with must be determined by viewing the facts contained in the government's sworn applications and supporting affidavits.

■ Throughout the affidavits submitted in applying for authorization to intercept wire communications in Zookeeper,

*United States v. Rios,* 611 F.2d 1335 (10th Cir. 1979) later appeal, 637 F.2d 728 (10th Cir.1980).

the affiant indicated that the purpose of the wiretaps was to determine the source of narcotics allegedly being distributed. The affidavit/applications contain many pages of probable cause information derived from direct observation and confidential source material upon which a judge or magistrate could determine that there was probable cause to believe that defendants Bartrem, Bongiorno, Gilbert and others, some not subject to the present indictment, were engaged in an illegal conspiracy to distribute a controlled substance, to-wit cocaine, but that the identities of their suppliers had, to date, eluded detection.

For example, it appears that undercover officer Bruner met with great success in infiltrating defendant Bartrem's drug trade. The officer was exposed to drug sales, the location of Bartrem's cocaine stash and was able to purchase cocaine from him. Officer Bruner testified that defendant Bartrem would "tell me anything I wanted to know" except that he persistently refused to identify his suppliers. For example, he often mentioned a "Harry" but never revealed that his last name was Gilbert.

Defendant DeWitt argues that sources were adequately identified through the use of conventional . investigative techniques. However, the application documents reveal only that an individual is identified who has a farm in South America and who "was a very smart businessman." There was no indication that he was a supplier or merely a contact, or, if a supplier, how, and with whom, if anyone, he operated. Similarly, the mere fact that Officer Bruner observed defendant Bartrem handing what appeared to be United States currency to defendant Gilbert does not establish him as a primary or solitary source of supply.[5]

The defendants note an apparent inconsistency in the affidavit/applications reciting the necessity for using both wiretaps and bugging devices in the Zookeeper investigations. They observe that on July 29, 1982, the Douglas County Attorney filed an application with the Douglas County District Court seeking authorization to intercept oral communication at the Prosthetic Dental Lab and defendant Bartrem's apartment located at 3427 North 93rd Street, Omaha, Nebraska. This application contemplated utilizing electronic "bugs" as opposed to wiretaps. The alleged justifica-

---

**5.** Defendant Bongiorno, relying on *United States v. Santora,* 600 F.2d 1317 (9th Cir.1979), contends that even if the initial affidavit/application is upheld, the adequacy of subsequent applications and extensions, which incorporate the first by reference, is subject to attack. In *Santora,* the Court found that the government's first affidavit had been sufficient to support the initial wiretap order over certain telephone lines. The government subsequently sought a new order seeking interceptions on different phones, while relying on statements made in the initial affidavit/application to the effect that normal investigative techniques had failed. The Court found the subsequent applications deficient. The Court required that an independent analysis as to the utility of conventional investigative techniques be made as to conspirators implicated in the subsequent applications. *Santora,* while sound on its facts, is not controlling here.

Of the nine allegedly insufficient affidavit/applications listed by defendant Bongiorno, seven involved extension orders on telephones already being tapped. As noted, *Santora* does not apply to extensions of existing taps. Defendant's arguments regarding the other two allegedly insufficient affidavit/applications must also fail.

Defendant Bongiorno contends that the November 17, 1982, application for interception of telephone numbers (402) 551–2189 and (402) 558–3385 failed to explain why conventional techniques were insufficient, citing to *United States v. Kalustian,* 529 F.2d 585 (9th Cir.1975). In *Kalustian,* the affidavits submitted by the government stated that alternative means of investigation had not been pursued because the knowledge and experience of the investigating officers led them to believe that such methods would fail. *Kalustian* is not controlling here. The affidavits before this Court set out over two years of investigation that had failed to discover defendant's source of cocaine.

Finally, as to the December 3, 1982, affidavit/application for interception of oral communications at 761 South 70th Street, the Court upon careful examination, finds that paragraphs 13, 16(c), 17 and 20 of that document sufficiently reveal the inadequacy of conventional means of investigation. Therefore, the Court finds that each of the respective affidavits and applications submitted to the Douglas County District Court fulfill the requirements imposed by 18 U.S.C. § 2518(1)(c).

tion for placement of the "bugs" is set out on pages 6 and 7 of the affidavit.

> Your affiant has been advised by Officer Griffith, that although the conversations intercepted between the aforementioned individuals and others as yet unknown are believed to be in regards to the distribution of illegal narcotics, these conversations have not revealed the source of these individuals' illegal narcotics, nor does it appear likely the source of their illegal narcotics will be revealed from telephone conversations intercepted. The officers believe the only method that will succeed is the installing and monitoring of an electronic device to intercept the oral communications of Ronald Bartrem, Joseph Bongiorno and others as yet unknown while inside of 3427 North 93rd Street, Apartment # 1 and the Prosthetic Dental Laboratory located at 3024 North 102nd Street, Omaha, Douglas County, Nebraska.

The intercepted conversations referred to by the County Attorney are, apparently, those conversations intercepted pursuant to the wiretap authorized on July 13.

The defendants contend that because wiretaps were sought after July 29, 1982, that their motions to suppress should be granted. The defendants also contend that the affiant mis-stated the reasons for Officer Bruner's dismissal from the investigation.

This latter argument will be disposed of summarily by observing that Bruner was in fact a target of Bartrem's sexual advances. It was the job of her supervising officers to decide whether she should continue under the circumstances.

█ As to the other alleged inconsistency, the Court notes that a determination as to which techniques of investigation would most likely uncover elusive suppliers is a determination that must often be made minute by minute as the investigation unfolds. The same Judge granted the application for a "bugging" device and the subsequent and continuing use of wiretaps. He obviously credited the integrity of the investigating officers. He was made aware of the day-to-day progress of the Zookeeper investigation. The Judge determined that the placing of some devices for interception of oral communications need not always foreclose the use of other or continuing methods of electronic surveillance. Deference must be paid to his opinion, *United States v. Landis*, 632 F.2d at 68; *United States v. Daly*, 535 F.2d at 437; and *McCreary v. Sigler*, 406 F.2d at 1268. It is noteworthy that, as earlier indicated, wiretaps were sought after the placement of the "bugs." It could be inferred that new information was being developed in the effort to discover the sources of supply. Additionally, the Court finds that defendants have not made a substantial preliminary showing that the affiant's statements were knowingly and intentionally false or that the statements were made in reckless disregard of the truth as required by *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978).

█ The state and federal wiretap statutes allow a judge to enter an order authorizing interception of wire or oral communications if the judge determines on the basis of the facts submitted by the affiant that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3) and *Neb.Rev.Stat.* § 86–705(3) (Reissue 1981). The Court finds the affidavit/applications demonstrate sufficient prior use of conventional methods of investigation to justify the use of electronic surveillance in the Zookeeper investigations. In this regard, law enforcement officials are not required to exhaust "all possible" investigative techniques before wiretap orders may issue. *United States v. Smith*, 519 F.2d 516, 518 (9th Cir.1975); *United States v. Baynes*, 400 F.Supp. 285, 299 (E.D.Pa.1975). Sections 2518(1)(c) and 2518(3)(c) are meant to ensure that wiretapping is not "routinely employed as the initial step in criminal investigation." *United States v. Giordano*, 416 U.S. 505, 515, 94 S.Ct. 1820, 1827, 40 L.Ed.2d 341 (1974). The statutory requirements are designed to

inform issuing magistrates and judges of the difficulties involved in the use of conventional techniques. *United States v. Fury,* 554 F.2d 522 (2d Cir.1977); *United States v. Lanza,* 341 F.Supp. 405 (M.D.Fla. 1972). Law enforcement officers must provide the court with sufficient information by which the court may make an independent assessment of the necessity of the wiretaps. *United States v. Fury,* 554 F.2d 522 (2d Cir.1977); *United States v. Bobo,* 477 F.2d 974, 981 (4th Cir.1973); and *State v. Golter,* 216 Neb. 36, 44, 342 N.W.2d 650 (1983). It is enough that the affidavit explains the prospective and retrospective failure of several investigative techniques that reasonably suggest themselves. *United States v. Hyde,* 574 F.2d 856, 867 (5th Cir.1978).

Several courts have observed that traditional techniques are as a general rule inadequate to identify additional conspiracies or the scope of a conspiracy. Particularly, courts have so held when the goal of the investigation is to identify the suppliers, customers and distribution system involved in a conspiracy to violate narcotics laws. *See United States v. Martino,* 664 F.2d 860, 868 (2d Cir.1981), *cert. denied,* 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982); *United States v. Johnson,* 645 F.2d 865, 867 (10th Cir.), *cert. denied,* 450 U.S. 991, 101 S.Ct. 1692, 68 L.Ed.2d 192 (1981); *United States v. Atkins,* 618 F.2d 366, 371 (5th Cir.1968). The Third Circuit has explicitly observed that wiretaps may be used in investigating the scope and nature of a conspiracy and are not confined to collection of minimal evidence of guilt of the parties subject to interception. *United States v. Vento,* 533 F.2d 838, 851–52 (3d Cir.1976).

Paragraph 38 of the affidavit/applications submitted on July 13, 1982, details the inadequacies of using surveillance, informants, pen register devices and undercover officers to identify the sources of cocaine supplies. The treatment provided in the section on informants (paragraph "B") is representative:

> Informants have enabled [sic] in the past to obtain evidence against individuals where the charges of possession and/or distribution of controlled substances, but none of the informants or confidential sources of information mentioned in this affidavit have been willing or able to provide this evidence. None of the current informants or sources of information are able to identify the source of controlled substances of Ronald Bartrem and his associates. None of the confidential informants or confidential sources of information mentioned in this affidavit and application have been able to provide information concerning the full extent of the conspiracy to distribute narcotics of Ronald Bartrem and his associates, and reasonably appear not to be able to do so in the future.

When read in concert with the 22 pages preceding it, which provide detailed accounts of all evidence gathered by physical surveillance, undercover officers, and reliable informants, this language cannot be construed as "general declarations" and merely "conclusory statements provided by the affiant," but instead are summaries of the affidavit as a whole. *See Golter,* 216 Neb. at 42–43, 342 N.W.2d 650, *citing United States v. Vento,* 533 F.2d at 838.

Defendants Burton and Bongiorno strenuously object to paragraphs 42, 43, 44, 45, 46, 47, 49 and 51 of the November 17, 1982, application for wiretap interception of one Ortiz's telephones. Those paragraphs recite, in concededly general terms, the difficulties involved in using physical surveillance, pen registers, the seizing of records and the use of informants to break open a purported drug conspiracy. However, these paragraphs fall under the "summary" section of the affidavit and follow over 6000 words devoted to detailing the results of the conventional techniques and their ultimate failure to uncover the top level suppliers. The paragraphs enumerated above are summaries and not bald generalizations and the affidavits, when comprehended as a whole, contain the required specificity. *See generally, United States v. Matya,* 541 F.2d 741 at 745 (8th

Cir.1976) *quoting United States v. Kerrigan,* 514 F.2d 35, 38 (9th Cir.1975).

Various defendants contend that the electronic surveillance was too continuous and failed to be restricted in accordance with the provisions set forth in 18 U.S.C. § 2518(4)(e) and 2518(5). Defendants attack the warrants on two principal grounds, claiming that they failed to provide (1) for minimization of communications not subject to interception as required by 18 U.S.C. § 2518(5), and (2) for termination of interception upon settlement of the authorized objective pursuant to 18 U.S.C. § 2518(5).

 The contention, argued most extensively by defendant Bierman, that the officers failed to adequately minimize the monitoring of calls unrelated to the Zookeeper investigation, insists that some calls listened to were logged as criminal in nature which, on their face, appear to have no connection with narcotic trafficking. For example, some of the calls labeled "criminal" concern horse racing, gambling, and the delivery of magazines.

Testimony before the Magistrate established that minimization is particularly difficult to perform on conversations involving drug trafficking. *See United States v. Manfredi,* 488 F.2d 588, 598 (2d Cir.1973), *cert. denied,* 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1984) ("in a narcotics conspiracy, the use of code words and cover-up jargon in methods of dealing make investigation most difficult.") The surveiling officers testified that conversations involving drug deals are often disguised with cryptic and misleading phraseology.

The accuracy of the officer's insight into the coded calls was verified on several occasions by surveillance and subsequent searches. Suspected purchasers were repeatedly observed proceeding to the distributor's location immediately following a "coded" call, remaining but a few moments

before departing. On at least three occasions, subsequent detention and search of the suspect's car produced quantities of cocaine.

 Nor can fault requiring suppression be found with the methods of minimization employed. In this investigation, officers assigned to monitor the calls were required to read the relevant affidavit/applications before hand.[6] All interceptors were instructed to distinguish between a personal and narcotics-related call and to terminate the monitoring process after sixty seconds if a call was identified as personal. The officers were cautioned against intercepting privileged calls. While the Court will concede that not every call was minimized with perfection, "it is ... obvious that no electronic surveillance can be so conducted that innocent conversation can be totally eliminated." *United States v. Bynum,* 485 F.2d 490, 500 (2d Cir.1973). The standard to be applied in determining whether the minimization was sufficient is the "rule of reason." *Scott v. United States,* 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978). The Court finds the law enforcement officers here made a good faith effort to minimize to the extent practical and electronically possible within the peculiar circumstances of a narcotic conspiracy.

The defendants further contend that evidence from the wiretaps should be suppressed because the Judge's order provided that interception would continue after communications involving narcotics were first detected. 18 U.S.C. § 2518(5) provides that no order entered under authority of the federal statute may authorize interceptions "for any period of time longer than is necessary to achieve the objection of the authorization, nor in any event longer than 30 days." 18 U.S.C. § 2518(5); *see also*

---

**6.** While the monitoring instructions were not included within the four corners of the authorizing orders, this defect is not fatal. In *United States v. Cirillo,* 499 F.2d 872, 878–80 (2d Cir.), *cert. denied,* 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974), the "omission of the talismanic minimization language" was held to be a mere "technical defect" which did not require suppression.

2518(4)(e).[7] Courts have recognized that the scope of the permitted interceptions must reflect the scope of the criminal conduct to be detected. *United States v. Cox,* 462 F.2d 1293, 1303–04 (8th Cir.), *cert. denied,* 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223 (1972). In *Cox,* the Court explicitly recognized that investigations probing a suspected conspiracy to distribute narcotics permitted interceptions beyond the first criminally related call.

*United States v. Escandar,* 319 F.Supp. 295 (S.D.Fla.1970), is also instructive. In that case, the affidavit stated that the purpose of the wiretaps was to identify the "sources of supply" of illicit narcotics sold by one of the defendants. The Court explicitly rejected the argument that interceptions should have terminated after the first criminal call was detected. Noting that the objective of the investigations had not been reached, the Court sanctioned the continuing use of taps in an effort to ferret out the source of supply.

■ In *United States v. Lanza,* 349 F.Supp. 929 (M.D.Fla.1972), the defendants sought suppression of evidence obtained in a gambling investigation. The defendants argued, as they have here, that the interceptions should have terminated after the first incriminating call had been monitored. The Court rejected their argument, noting that:

> To suppose that the investigation should have been terminated once the bottom of the ladder had been found, once the persons who took individual wagers had been identified, is unrealistic. These are but the tip of the iceberg; they can always be replaced. To root out the offense, those who are ultimately responsible for its existence and organization must be found, and the affidavit amply demonstrates that this would be impossible by any means other than by using monitoring to observe the actual transaction of business between the sellers and their superiors.

*United States v. Lanza,* 341 F.Supp. 405, 420 (M.D.Fla.1972). In the present case, the top level suppliers were never uncovered, and therefore the "authorized objective" was never attained. *See United States v. Carubia,* 377 F.Supp. 1099 (S.D. N.Y.1974) (the mere fact that "probable cause" may have existed for the arrest of various individuals did not mean that the interception should terminate because "the trail did not end there." *Id.* at 1103.) Thus, it was proper for the interceptions to persist in order to "pierce the veil of the conspiracy." *Lanza,* 349 F.Supp. at 933–934.

■ Finally, defendant Willy contends that the wiretaps of the phone at the Prosthetic Dental Laboratory, authorized by the extension order entered on November 17, 1982, which led to the discovery of cocaine in his car on December 1, 1982, were unlawful because the supporting affidavit included his name as one of the several individuals, including defendant Bartrem, whose communications were sought to be intercepted but failed to recite a probable cause showing as to him. The government concedes that the affidavit failed to recite probable cause as to Willy. Upon *de novo* review, and after consideration of additional evidence provided by the defendant, the Court agrees with Magistrate Peck's finding that the inclusion of Willy's name in the order was harmless error.

The interception of calls to or by defendant Bartrem was authorized by the original order of July 19, 1982, and by subsequent extensions. The Court has examined the logs for all conversations monitored by the Dental Lab telephone from November 17 until the interception was terminated on December 15. The Court finds that the calls made at 1:46 P.M. on December 1, at 3:16 P.M., 3:19 P.M., and 3:20 on December 2, were either too short to be minimized or were not of an incriminatory nature.[8]

The Court notes that Magistrate Peck did not refer to a call made by Willy at 5:16 P.M. on December 1 of 1982. A transcript

---

**7.** The state counterpart is *Neb.Rev.Stat.* § 86–705(6) (Reissue 1981).

**8.** One of the four calls was made to Northwestern Bell's time information line.

of this call is attached as Exhibit "A" to defendant Willy's brief in support of exceptions to the Magistrate's findings. The call was shorter than a minute long and was thus too short to be minimized. Furthermore, evidence reveals that this was not the call which led to the search of defendant Willy's car. Instead, it was a call that took place between Bartrem and Willy at 4:42 that same day, properly intercepted because of Bartrem's part in it, that led to the search. The Court finds that the inclusion of Willy's name without a recitation of probable cause is harmless error and constitutes no basis to suppress the search of the automobile.

In arriving at its decision, the Court has thoroughly reviewed all evidence in support of, and in opposition to, the defendants' motions to suppress, including, but not limited to, the transcript and exhibits from the evidentiary hearing held before the Magistrate on October 24 and 25, 1983, the Magistrate's Findings and Recommendations and all materials submitted for his consideration, oral argument by defense counsel, the testimony of Officer Bruner, and over five hundred pages of argument submitted by the parties.

Having considered all contentions of the parties both collectively and individually, the Court finds the wire and oral interceptions in this case substantially comply with the letter and spirit of the authorizing statutes. Therefore, each motion to suppress evidence obtained by electronic surveillance in the present investigation should be denied.

Accordingly,

IT IS ORDERED that all motions of every defendant concerning suppression of evidence derived by electronic surveillance including all wiretaps and "bugs" should be and hereby are denied.